2007-1276, International Technology v. Navy Good afternoon, I am Peter Jones, appearing for the new contractors in this case. May it please the court, the court has before it in this case a matter that involves an issue at the very root of the common law of contracts. And that is whether what happened in this case was a breach. Do you agree that in order to establish a breach you have to show that the contractor reasonably relied on the soil information that was provided in the CDER report? There are cases that say that in order to recover for a breach of warranty, the contractor should show that he relied, and reasonably relied. And that showing was definitely made in this case, it was even found by the board. So do you agree that the contractor has to show that he reasonably relied? That statement isn't included in Hollerback, which we think is the seminal case here, nor is it included in the General Authorities on the Law of Contracts. What's your position? Our position is first, yes we agree that there are precedents in this court that say there has to have been reasonable reliance. We believe that we showed that we put in the proof at the ASPCA and that they found it. However, I would submit to the court, in terms of what the law is, that that requirement really goes, the statement of reliance really goes to materiality and to causation, rather than to has there been a breach here at all. Let's assume that we are obligated to follow those cases and we have to find reasonable reliance. What was the evidence as to TerraCline's reasonable reliance on the CDER report? Did you have a witness, an expert witness? No, we had a recipient witness. The TerraCline's chief executive, TerraCline's owner actually, who testified, as the board stated in its findings, that TerraCline relied on those soil composition reports. Well, I think that's clear or not, but the question is whether it was reasonably relied on. Was there any testimony that the reliance was reasonably relied on? I don't know that that was specifically stated. I don't know that that was placed in issue. I think that the testimony on that subject in total established that that was the primary, if not the only, information available to TerraCline about the composition of the soils throughout this stockpile. Yeah, but the problem with the CDER report is that it doesn't really say that the soil samples are representative of the site. If you look, for example, at the patient, unfortunately, with supplemental appendix number 4-4 of the CDER report, which is scan 1. And under soil sampling, it says that patients were selected based on visual observation of soil types, such as spines or sand samples were selected to obtain a mixture of soil types representative of the soils to be treated during the pilot scale treatability study. Well, that doesn't say that the soil samples were selected to be representative of those of the site, does it? It says below, the pilot scale's treatability study included a collection of grab samples and preparation of composite samples from the solvent extraction tanks and the bioremediation stockpile. My point is, where does the CDER report say that the soil samples are representative of the site? Meaning the entire stockpile of this material? Yeah. The table 215, soil characteristics, just refers to soil characteristics NCS stocked. At 2-9, the paragraph that appears there, by the way, I should inform the court that the document, as we've put it in our supplement here, is exactly as it appeared in the board's evidence file, with these underscorings and the like in it. So I don't even know the origin of those, but I just want to tell you the document is as it was. It says table 215 summarizes the characteristics of the soil from sites 4, 5G, 5H at NCS stock. So it was from all of these areas where the contaminated material was dug up. Yeah, but it doesn't say that the digging up of contaminated material was designed to be a random or other representative sample of the entire site. These sites, 4, 5G, and 5H, were comprised of the entire site or the entire stockpile of these materials. Because when the delivery order was issued, the soil wasn't in a site, it was in a big heap. So the soil had been moved around by bulldozers and put into heaps? What was going on? Yes, at some time prior to this delivery order, and I think prior to IT's contract, someone, another government contractor, it might have been PRC, had actually gone into this Navy property and dug up the contaminated dirt. So all the contaminated dirt was dug up. All the contaminated soil that IT was tasked to work on, yes, to remediate. And it was in big piles at the time that the delivery order was issued. So what you had was this heap of dirt, soil, and one heap or several. The original delivery order said there were two heaps, but the testimony was that by the time this work commenced, it had all been consolidated into one. Well, at the time the soil samples were taken, it looked like the procedure was one heap or two. Or perhaps three, since there were three different sites referenced. I don't think this report states whether the samples were taken in situ, that is, where the dirt originally lay, or after it was piled up. When I refer to sites 4, 5G, and 5H, I assume those were different gridded off locations on the Navy property. Am I wrong on that? Yeah, there were zones on the island, just a portion of a grid or something like that. So those were three separate areas where the contaminated soil was meant to be extracted and cleansed, right? No, it had been extracted. It had been. By the time these contractors became involved, that soil had been scraped up or dug up and moved to another location. I see. So when they say sites 4, 5G, and 5H, they weren't necessarily when they went to take these soil samples going to three separate places, but rather going to one big heap, which was the culmination of what used to be in sites 4, 5G, and 5H. Well, I really don't know at the time that this report was prepared, whether there were three heaps of dirt, or two heaps of dirt, or one heap of dirt. Part of the problem is that we can't tell from this report how the sampling was done. And you say there wasn't any testimony about the reasonableness of the reliance. So how do we know that the contractors would reasonably rely on these samples to show what was supposed to be processed? That's the problem. Counselor, can I help you for just one second? This may respond directly to Judge Dyke's question, but also to this overall problem we're having of heaps versus locations. This report goes through and in multiple places identifies soil, the characteristics thereof, and the effectiveness of the DDT treatment by the site number. So it seems to me if it was all in one heap, you would say this is the heap of soil from 4, 5G, and 5H, and it would be virtually impossible to then say the levels of DDT in treated site 4 soil were X. The levels in treated site 5 soil were Y. If it was all heaped together at the point in time in which these samples were taken, it wouldn't have been possible, would it, to distinguish how effective the DDT treatment process was by site, would it? I mean, wouldn't those sites have been all mixed together? Would you throw them into a heap? Isn't that what you're suggesting? I don't know if the evidence discloses that. But, Judge Dyke, there is evidence in the record as to how these samples reported in Table 215 of this document were taken. We had a witness testify as to exactly how it was done. Also, the text itself, what was that testimony? The testimony was that the person collecting the samples went throughout the stockpile and at, I believe it was random locations, took what they call grab samples, literally using a trowel or something like that, threw some dirt in a bucket, and then at some point accumulated, I think they took it a gallon at a time, a gallon of those samples, mixed them up, and then they were sent to a laboratory for analysis. Before you conclude, and I realize you're in your rebuttal time, and I'll give you a little extra time, there is reference to an FFS report. We did not ask for a copy of this FFS report, but on page 18 of the appendix, paragraph 11, refers to the findings that this FFS report included several samples from the stockpile sites, and many of the samples were classified as CL, CH, or ML. CL meaning that the majority of the weight of the soil sample was clay. Now, I realize this is qualitative and not quantitative, but nonetheless, that does seem to suggest that there was some evidence in this report anyway that indicated high clay content. And that was a report that was referenced in the initial contract as well as the center report, if I'm not mistaken. That's correct, and I think the boards here has correctly characterized it. It didn't indicate high clay content. It indicated that various of the samples included clay, and there's no issue with that. Well, it says the majority of the weight was clay, which seems to indicate, for me anyway, that more than 10%, maybe more than 50%, was the majority. It's certainly a flag that if I were a contractor, I would have to understand that some significance. And in the testimony, Mr. Cash, who was the principal of TerraClean, who prepared this bid and entered into the subcontract, went through all of those and stated exactly how he considered them in formulating the bid. What was his testimony suggesting the significance of this report? Well, the tables in that report were reporting things like chemical content and the like. They weren't strictly soil composition reports. The CL designations were virtually incidental to those, and he said that's something that you look at, and it's one of the elements you put in your equation here. But when you actually formulate a notion of what definitively it is going to take you to do the work, you have to use the specifics, and that's what he said. That's what he said in his testimony, and I would point out again that that's what he said in his bid to IT, which we put in the appendix where it says, we have assumed that the soil has less than 10% clay, which is what is reported in 215, because of that information that we got from the TerraClean's assumption about less than 10% clay. I don't believe it did. That was their proposal to IT. It might have gone there as part of the subcontract approval package, which the prime contractor would have had to submit, but I can't represent to you that I know that the evidence said that to be true. What I'm talking about is, did this subcontractor rely on this specific soil content information? And the answer to that is he did it, and he said he did it in writing at the time. Not after the fact. Wait, wait, wait. What he said was he assumed that there was less than 10% clay, but we at TerraClean make reference to the Cedar report as the basis for that assumption. I don't believe that their proposal specifically referred to that, but he certainly said that in testimony. He said that's where I got that figure. With every score of four minutes of your rebuttal time, let's hear from the government now. Thank you. Just even out of the time, we'll give the government an extra four minutes as well. Thank you, Your Honor. David Hagman from the United States. We're a police court. We believe that the court should affirm the decision for contract appeals because the contract included a limitation of cost provision that was not adhered to by IT Corporation. The limitation of cost clause means that the government is not operating. Before we get on the limitation of cost, can I follow up on the line of questioning that you had with Dave Powell? Would you mind if I redirected you there? Of course not. Thank you. Was there a contention below on the part of the government that there was no reasonable reliance on the Cedar report by TerraClean? I think the first way to look at that is there was no finding of fact that there was ever an error itself in the report, in the Cedar report, or in any other report. Well, wait a minute. You would agree with me, right, that the report represents 6 to 11% claim, that that is not what later sampling discovered was actually present. You would agree with those fact findings? Well, for table 215, that's correct. The Cedar report also says that there is between 24% and 63% of silt and clay content in the soil. And the Cedar report also states- Right, and the silt and clay still was off, but not off by a huge amount. But if you were just to focus on the clay, because there was lots of testimony by the CEO of TerraClean that the clay really was the determining factor in how difficult it was going to be for permeability purposes to maintain the soil. So if you were to focus in on that, you would agree that there is clearly a difference between the 6 to 11% clay represented in the Cedar report and what was ultimately found, which was 23 to 28%, roughly, clay. Those are the fact findings of the lower part. It is true that there is a differential, that there were two findings of fact that, as you just indicated, show that. However, the court, the board, did not find that either analysis was erroneous. The board said there is this finding of fact indicating high levels of silt and clay content. And there is another analysis that was done by TerraClean that also shows high levels of silt and clay. And the court, taking into account all of this information, said it didn't reflect any kind of warranty, certainly by the government, that this is what the silt and clay content of the entire area was. I think it's also important... I was troubled by the suggestion that it has to be culpability, so there has to be some error here. If the government represents that such and such is a fact and the bid is prepared based on that, it doesn't make any difference whether that representation was based on good science or bad science or investigation. That investigation is still a representation on which the contractor was entitled to rely. So the question here, it would seem to be, is whether this, and there have been a number of cases about this, is whether the contractor was entitled to rely on the CEDA report. And there can be a lot of reasons why it was, and a lot of reasons why it wasn't. So the question would be, was the sampling represented to be representative of the material that had to be processed? That would be the question. I'd like to raise a number of important issues. The first one is the idea that the board suggested that there needed to be culpability involved in this representation. As we stated here today, we're not taking that position. With regard to relying on this CEDA report, I think there are some important reasons. We think there are some important reasons why relying on it is probably not the strongest thing to do. If you look at 1-1, which is the first page of the report, the report itself is focused on evaluating TerraClean solvent extraction technology. And it's not to analyze soil permeability. It is an assessment of the solvent extraction technology. That's what the basis of this report is. And if we look also at, it talks about a technology assessment, a remedy selection. And if we look towards the objectives of the report, which is on 1-9, and it lists primary objectives and secondary objectives of this report, nowhere does it state in any of the primary or secondary objectives that a study or analysis of the soil permeability is sort of paramount or involved with this report. Council, in 1-9, you just directed it to under secondary objectives. S1 says document soil characteristics. Right. So soil characteristics, however, if you look at that, it's talking about the levels of DDE, DDT, and the like. It says nothing in there about clay or silt or even sand or gravel. It says collecting and analyzing untreated soil during the bench scale treatability study. Well, wouldn't you agree that part of the analysis of the soil included a measurement of clay and silt content? We would not want to suggest that this report did not at all contemplate, obviously it does contemplate the levels of... It does not contemplate. Isn't that one of the objectives? Document the soil characteristics, collect and analyze untreated soil during the bench scale treatability study. The bench scale treatability study is repeatedly referred to as including documenting the soil characteristics, namely the amount of clay and silt. I'm confused. Well, we would respectfully disagree with that reading of the... Tell me why I'm reading it wrong. It certainly doesn't state explicitly or implicitly, for that matter, that it is referring to silt or clay. The object... I'm further reading in that same paragraph. The object is to identify contaminants other than DDT that affect tear cleaning process. For example, large amounts of TEPH constitute slow down the process. Well, wouldn't large amounts of clay also slow down the process because it would have to be repeated over and over and over and over? I mean, that's 11 times is what they said. They were expecting 2 to 3. It ultimately had to be washed a lot of the soil 11 times because of the clay. Well, again, I don't see anything. We don't see anything in this paragraph that discusses anything beyond DDTs, VOCs, hydrocarbons, particle size distribution. Those are contaminants, and that's what... There's a lot of reference in this report to the soil permeability affecting the cost of the treatment. It seems to me that there are two possibilities here. One is that the soil sample selection was designed to provide a good test under a variety of different conditions of the treatment methodology. In other words, you wanted to find soils of different characteristics so that you could evaluate the feasibility of the technology under different soil conditions. That's one possibility. Another possibility is that the soil sample selection was designed to be representative of the site as a whole. And it seems to me that those are two quite different things. At first, it was just to get different types of soil to test the process. Maybe it wasn't reasonable for the contractor to rely on this as being representative of the site. If, on the other hand, the report was designed to be representative of the site, then it probably was reasonable to rely on. So you really need to address which of those two things was involved here in the soil sample selection. Again, the report itself raised an issue early on in the question. The discussion of soil permeability is only discussed once. It's at 2-9. There's, of course, a table. So it's not discussed throughout the report. At 1-9, where it talks about particle size distribution, that's directly relevant to permeability. That's the only reason you care what the particle size distribution is when technology is handling it. And that's, again, an objective. You pointed me to it. Well, again, we have stated that, of course, the report does involve a discussion of silt and clay, but it is not a primary or secondary objective of the report. And I think also this goes towards the documents that we were asked to provide the supplemental appendix. If we look at Delivery Order 102, delivery order – I think it is critical that you do – what evidence did the government proffer that the soil samples taken for purposes of analysis in this year's report were not representative of the site that was to be cleaned? I'm not aware of that testimony. Is it your belief that this report would be a representative of the soil that one was expected to clean as pursuant to this contract? We would suggest that this report makes no warranty at all about the site and the soil characteristics. It analyzes soil from the site. The question is, is it analyzing soil that is representative of all the soil there? You can't say it doesn't make any warranties or representations. Clearly it makes representations about the soil that was selected. So the question is, is the soil – yes, because the delivery order points you to it. But let's stay on track because this is probably a very important question in this case. Is the soil that was tested representative of the soil that was to be utilized or the soil that was to be treated ultimately?  You can go to the delivery order if you want. I'd be eager to get there. I've kept you from it. No, no. Well, the delivery order is – So what does that mean? Are you agreeing that the seed report was representing that the soil samples were representative of the site as a whole? We're not saying that. We're saying that from the soil that was sampled and that was piled up in three piles, from that standpoint, the samples are representative of what is found at three sites on the site itself, at the site. What was the situation when the samples were taken? Were there three piles or was it spread out on the site? There were three piles that were heaped together from three different sites. Well, what are these references? These numbers, 5H or whatever it is. Those were the areas that they were taken from. Those are the – on the island itself, I believe, it's from the three different building areas where the samples were taken. Are you saying that this report simply reflects the testing that was done at various samples from various sites and nothing more? In other words, that there were two samples taken from Site 5G, two samples taken from 5H, four samples, five samples taken from Site 4, and these are there and they are analyzed, and there's nothing more that says these are typical of soil conditions that exist throughout. That's correct. That the report stopped short of the last statement. Correct. So it's simply a representation that samples were taken at various places and samples have these characteristics and nothing more. That's correct. And so the government's position is that the contractor was directed to that simply to give the contractor some sense of typical soil conditions, representative soil conditions. What was the purpose of referring the contractor to that set of reports if the only thing it says is that certain samples were taken in certain places? I'm thinking of what it says. And that's where Delivery Order 102 comes into play because that delivery order states, requires the contractor to examine the set of study because it will assist the contractor in preparing plans described in Task 2 of this delivery order. And Task 2 involves a construction work plan, a contractor quality control plan, and a site-specific health and safety plan. Interestingly enough, it does not say that it will assist with Task 4 of the delivery order, which is treat the DDT-contaminated soil. And again, this goes back to my original point about the center report itself. The center report itself has bigger fish to fry than soil characterization. It is talking about how effective the TerraClean solvent extraction process is. That's the assessment, and that is what the major part of this report involves. And this is information that the government had that it believed would be helpful to a contract. And it's, of course, something we haven't discussed, is the fact that this is an analysis of work that was done by the subcontractor on this case that is bringing the pass-through claim, and that is TerraClean. TerraClean literally is the people who had their fingers in the dirt, as it were, and were taking these. Are you saying TerraClean collected the samples? Well, TerraClean... You said fingers in the dirt. Are you speaking literally or metaphorically? Well, they treated the ponds, yes. They performed the DDT extraction process. They didn't come up with a 6% to 11% number or actually collect the samples, did they? No, but they did provide technical input. I want to move you to this FFS report. Unfortunately, we don't have that in the appendix. Do you think this report... Suppose that I think... Suppose it's my belief that the CDER report misrepresents to the contractor the amount of clay present. Then the question becomes whether or not the contractor reasonably relied on that misrepresentation. Do you think this FFS report prohibits an argument that the contractor reasonably relied on the 6% to 11% representation because this report makes it clear that at least some of the soil analyzed was the majority clay? Meaning, should this report have flagged a red flag? Even if the contractor had looked at the CDER report and relied on those numbers, 6% to 11% clay, even if that really mattered in the end, they probably shouldn't have relied on it reasonably because there's a second report that the government also records. And that second report casts a shadow of doubt on 6% to 11% or even directly contradicts anything. I mean, is that something that the government would contend? We would contend that the FFS report supports the idea that there is more clay and soil content present. Than what was found in the CDER report soil sampling? Correct. And so do you think that this FFS report should have put the contractor on notice that maybe they needed to do some more sampling before they came up with an estimate? What should they have done? That's the thing. You have a representation here, 6% to 11% clay, and then they've got to put together a bid. What would you like to have them do so they could properly prepare themselves to come up with the right number to give you? Well, I'm not a soil treatment contractor, so I can't answer that question. Based on their knowledge, certainly their knowledge of the property itself, the site, and based on its knowledge in the industry, and the fact that the CDER discusses that the solvent extraction cycles took much longer than expected due to reduced permeability, thereby increasing time and cost, all of these things would, a responsible contractor would base its bid on that. In fact, throughout the conduct of the contract, there were multiple modifications. There were as many as nine modifications that were made, consistent with the limitation of cost clause, with the understanding between the Navy and the contractor that there were delays occurring. All right. Thank you very much. Questions or comments? I'll stick to the subjects that were addressed. Concerning reliance, which is a question of fact, what did this contractor do in formulating his bid? The board did find, this is a quote, Mr. Alan B. Cash, president of TerraClean. Where is this? This is in the ASPCA's decision, appendix page 17, finding of fact number nine. So there's a finding there that Mr. Cash testified to TerraClean's reliance, and that finding is final. But I would also, again, in full response to your questions, Judge Dyer, invite your attention to TerraClean's proposal to IT Corporation. By the way, IT is their correct name. It's international technology here. I'll use IT. The section of the proposal, this is before all these events occurred. This wasn't generated afterwards. It says, TerraClean has assumed that the contaminated soil contains an overall clay content of less than 10% clay. The next sentence says, TerraClean has reviewed... Yes, this is appendix page number R4-202.19. R4-202.19. In paragraph 2.7, the sentence that follows says, TerraClean has reviewed the pesticide contaminated soil composition data provided by the contractor and provides the following summary of that data. And those data were the data in the technology evaluation report tables. Again, as I said, the questions of both reliance and reasonableness are questions of fact, and we believe that those facts have been determined. But there isn't any finding about the reasonableness of the reliance, right? I don't think there's an express finding on that point, Your Honor. But certainly there was no finding to the contrary, nor a finding that it was an open issue. And it wasn't argued by the government in this case at all. Thank you.